UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**BENJAMIN L BROWN, SR**,<br><br>Debtor. | Case No. **11-62288-11** |

**MEMORANDUM OF DECISION**

At Butte in said District this 3rd day of April, 2014.

Pending in this Chapter 11 case is the Debtor's "Motion for Final Approval of Auction Sale of Ranch Property" ("Motion") (Document No. 303) filed on December 6, 2013. Objections (Doc. 312) were filed by Charlie Hamwey and Real Estate by Hamwey (together "Hamwey") which asserts that Hamwey is entitled to a six percent (6%) real estate commission based on his listing agreement with the Debtor under theories of equitable estoppel and other equitable relief under 11 U.S.C. § 105(a). A hearing on Debtor's Motion was held at Billings on February 25, 2014. The parties were represented by counsel. Exhibits and witness testimony were admitted. After conclusion of the parties' cases-in-chief the Court heard argument of counsel, after which the Court deemed the matter submitted and took it under advisement. After review of the record, Motion, Hamwey's objection, replies, and applicable law, this matter is ready for decision. For the reasons set forth below Hamwey's objection will be overruled and Debtor's Motion for Final Approval of Sale of Ranch Property will be granted by separate Order.

This Court has exclusive jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a). Debtor's Motion for sale of property and Hamwey's objection and request for compensation are

1

core proceedings under 28 U.S.C. § 157(b)(2).

The Debtor Benjamin K. Brown ("Debtor" or "Brown") was represented at the hearing in support of his Motion by attorney Gary S. Deschenes ("Deschenes") of Great Falls, Montana. Charlie Hamwey ("Charlie") appeared and testified, and Hamwey was represented by attorney David T. Sulzbacher ("Sulzbacher") of Christensen Fulton & Filz, PLLC, Billings, Montana. First Interstate Bank ("FIB") was represented by attorneys Benjamin Hursh of Missoula, and William D. Lambdin, III, of Billings.  J.P. King Auction Company, Inc. ("J.P. King") was represented by attorney Bob Sullivan, and Jeff Hathorn ("Hathorn") testified.  Hamwey's Exhibits ("Ex.") A, B, C, D, E, F, G, FIB's Ex. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and JP King's Ex. 1 and 2, all were admitted into evidence without objection.  At FIB's request the Court took judicial notice of items on the case docket.

## FACTS

Charlie Hamwey is a real estate broker in Billings, with over 41 years of experience, although he testified that he never worked as a realtor in a bankruptcy case until the instant case. Hamwey entered into a one-year, exclusive "Land Listing Contract," Ex. A, with Puuona Estates LLC[1], dated September 27, 2010, to sell 426.037 acres of ranch land on Molt Road in Yellowstone County, Montana, for $5,500,000.00.  Charlie testified that Hamwey maintained a "For Sale" sign on the ranch property since 2010 until the auction sale of the property in November 2013, and that no one ever told him to remove the sign.

Under Ex. A Hamwey was entitled to a six percent (6%) commission upon finding a

---

[1]No evidence was offered explaining the relationship between Brown and Puunoa Estates LLC, which is the seller named in Ex. A although Brown signed Ex. A for the seller.

2

buyer ready and willing to purchase the ranch property at the listed price. Charlie testified that the 6% commission was a combination 3% commission for listing and 3% for selling the property, and that listing and selling are considered separate services. The listing agreement by its terms expired after one year, or on September 30, 2011. Hamwey and Puunoa Estates LLC did not extend the listing agreement before it expired, but Charlie testified that they extended the listing after it expired.

Brown filed his voluntary Chapter 11 petition on December 9, 2011, and filed his Schedules and Statement of Financial Affairs ("SOFA") on January 12, 2012. Charlie testified that he was not aware of Brown's bankruptcy filing, and he did not become aware of it until the middle of 2013. However, on cross examination Charlie admitted that he was aware of Brown's Chapter 11 case when he signed his affidavit of disinterestedness in support of Debtor's application to employ Hamwey on May 30, 2012.

Schedule A lists Debtor's real property, including his residence located at 8056 Molt Road which he valued at $1,300,000.00. The ranch property does not appear to be separately listed on Schedule A. Schedule B lists personal property, but no interest in the Seller named in Ex. A, "Puunoa Estates LLC," is listed in Schedule B.[2] FIB is listed as a creditor on Schedule D with a fully secured claim in the amount of $1,402,772.56 on Schedule D, and an unsecured claim in the amount of $1,828,091.58 based on the Debtor's personal guarantee of a loan on land owned by Puuona Family Trust, LLC (Echo Canyon Estates).

---

[2]Item 13 ("Stock and interests in incorporated and unincorporated businesses. Itemize.") includes Debtor's interest in "Puunoa Family Trust, LLC," of which the Debtor is named as sole member, at a value of $3,700,000.00. No evidence was presented establishing whether "Puunoa Family Trust, LLC" is the same entity as "Puunoa Estates LLC."

3

Ten days after the date on which Brown filed his Chapter 11 petition and without filing an application in this Court seeking approval of employment of Hamwey to market and sell the ranch property, Brown and Hamwey entered into a modification of the listing agreement. Ex. B is the a modification to the listing agreement lowering the listing price of 8060 Molt Road from $5.5 million to $4.9 million and extending the expiration date to September 30, 2013. Ex. B is signed by Hamwey on 12-19-2011 and by Brown on 12-20-2011. Charlie admitted that Ex. B was signed after the original listing agreement had expired. He testified that Brown was in Hawaii and could not sign Ex. B until he returned.

Charlie admitted that he did not send Ex. B to Deschenes or discuss it with him. Charlie testified that he thought the asking price was too high even after it was reduced to $4.9 million,[3] and no offers were received in more than a year during his listing, although three parties looked at the property.

Debtor filed an application, FIB's Ex. 1, to employ Charlie as real estate broker on May 30, 2012, for the purpose of selling Debtor's condominium located at 1400 Poly Drive, No. 3C, in Billings, Montana, at a 6% commission rate. That application was filed with Charlie's affidavit stating that he is disinterested and does not hold any interest adverse to the Debtor or estate in the matter in which he was to be engaged. The Court approved the application to employ Charlie. He testified that he was not clear on whether his employment as realtor to sell the ranch property required an application to be filed with the Court, and he agreed on cross examination that nothing in Ex. 1 entitles him to a commission for the sale of the ranch property.

A sale of the condominium at 1400 Poly Drive, No. 3C was approved without objection

---

[3]Charlie believed the value of the ranch property was $2.5 million.

4

after notice and hearing by Order entered on June 12, 2012. Charlie testified that the sale of the condominium closed, and that he was paid a 3% commission on the sale.[4]

Debtor filed his plan and disclosure statement. FIB filed objections to confirmation (FIB's Ex. 2) on the grounds Debtor did not propose the plan in good faith because he failed to describe the terms for sale of his properties to fund the plan and for overvaluing the properties, the plan is designed to preserve Debtor's "lavish lifestyle" while keeping creditors at bay, the plan is not feasible, and the plan fails to satisfy the "best interests of creditors" requirement of 11 U.S.C. § 1129(a)(7)(A)(ii). A stipulation and agreement between Debtor and FIB (Ex. 3) was filed on July 23, 2012, resolving FIB's objections to confirmation. The stipulation and agreement by its terms was incorporated into Debtor's plan and it provides for treatment of FIB's claim secured by the ranch property. Paragraph 5 of Ex. 3 provides:

> The Debtor agrees to list the Ranch Property for sale with Charles Hamwey and Real Estate by Hamwey ("Hamwey") during the Ranch Listing Period at a listing price of $4,500,000.00, subject to Mr. Hamwey's periodic review and reduction to an amount that he reasonably believes will generate offers on the Ranch Property by July 1, 2013, and Mr. Hamwey will periodically consult with the Debtor and the Bank to arrive at mutually acceptable adjustments to the listing price of the Ranch Property in furtherance of generating offers by July 1, 2013. Hamwey's listing of the Ranch Property will terminate on July 15, 2013, with no residual commission rights in any auction activity to follow except with regard to any agreement by and between the auctioneer and Hamwey wherein Hamwey agrees to market the Ranch Property and obtain a fee through the Bank-approved auctioneer as part of the Auctioneer Commission Fee (defined in Paragraph 6 herein).

The Court approved that stipulation and agreement by Order entered on July 24, 2012 (Ex. 4). That Order bound the Debtor and FIB to the terms of the stipulation and deemed it incorporated into Debtor's plan. Charlie testified that he learned about the stipulation (Ex. 3)

---

[4]The other 3% was paid to another realtor.

5

long before the auction sale of the ranch property, but that he was not aware of the provision quoted above that his listing of the ranch property terminated on July 15, 2013. He testified that he continued to list the ranch property after July 2013 notwithstanding the termination of his listing under Ex. 3.

On August 27, 2012, Debtor's attorney Deschenes sent Charlie an email, Ex. D, asking Charlie to send Deschenes the listing agreement he had with Brown for the ranch property on Molt Road. Ex. D states: "We need to file your employment documents with the Bankruptcy Court for that property also." Charlie testified that he forwarded Ex. B to Deschenes after he asked for it, with the understanding that it would be submitted.

Debtor's disclosure statement was approved, and Debtor's Chapter 11 Plan was confirmed by Order (Ex. 5; Doc. no. 231) entered on October 1, 2012. Ex. 5 confirms the Plan as supplemented by stipulations, including the stipulation and agreement with FIB.

On September 19, 2013, Debtor filed a motion for expedited sale of properties, including the 430 acres of ranch property located on Molt Road. Ex. 6 is the motion, and states that Debtor wishes to employ J.P. King to sell the properties by auction. Debtor filed an application, Ex. 7, to employ J.P. King, which the Court granted by Order entered on September 24, 2013. Ex. 8. Attached to Ex. 7 is an "Auction Listing Agreement" ("ALA") signed by Brown and J.P. King, J.P. King's Ex. 1, dated September 19, 2013, which sets forth the terms of J.P. King's employment and which the Court approved.

Paragraph 7 of the ALA provides that it is null and void unless the Bankruptcy Court enters an Order including specific language set forth in the ALA. Hathorn worked as an independent contractor for J.P. King for 35 years. He testified that the ALA is a form agreement

6

used by J.P. King, and that without a court order which includes the language from the ALA, J.P. King would not have gone forward and conducted the auction.

Charlie testified that he first learned of the auction sale in late August or early September of 2013. He testified that the Debtor told him about J.P. King being an auction company, and that Brown told him to cooperate with J.P. King.[5] Charlie testified that he spoke with Hathorn, who asked him to find buyers for the auction. Charlie testified that he believed that he would still be entitled to a 6% commission for listing the property, and he testified that no one told him to stop advertising the property or that he was not entitled to his 6% listing commission. Hathorn admitted that he was aware that Hamwey was listing the property, which Hathorn thought might generate buyers.

Charlie claims that he relied on the standard of practice to split the selling commission with J.P. King. Charlie testified that he does not agree that he was entitled to a commission under the ALA only if his buyer bought the ranch property at auction.

On September 30, 2013, Charlie and the Debtor entered into another modification of the listing agreement, to expire on December 31, 2013. Ex. C is that modification, and the dates of Charlie's and Brown's signatures on Ex. C is 9-30-2013. Charlie testified that he called Brown when he noticed that his listing agreement had expired, again. Ex. C was not filed or approved by the Court. Charlie testified that he remembers signing Ex. C, and that when he signed it he was aware that the ranch property was to be sold at auction. He testified that he did not speak with Deschenes about Ex. C.

---

[5]As evidence of his cooperation, Charlie testified that he gave the Debtor and J.P. King Ex. F, an engineering report he had in his file showing costs to subdivide the ranch property "Preliminary Project Cost Summary."

7

Charlie denied that Ex. C was backdated. However, under cross examination by Deschenes Charlie admitted that he entered the date next to Brown's signature and sent it to Brown, and that Brown told Charlie that he was in Hawaii, and Brown did not sign Ex. C until he returned to Montana 2 or 3 weeks later in October 2013.

On October 1, 2013, the Court entered an Order, Ex. 9, approving Debtor's motion to sell the property, including the 430 acre ranch property, free and clear of all liens except taxes, at public auction as provided in the ALA with J.P. King. That Order, provides at pertinent part at pages 1-2:

> IT IS FURTHER ORDERED that the Debtor is authorized by the Court to sell the subject Property at public auction, as provided in the Auction Listing Agreement ("ALA") entered into by and between Debtor and J. P. King Auction Company, Inc. ("King"), which agreement has been filed with the Court and is affirmed, ratified, and incorporated into this Order in its entirety;
>
> * * * *
>
> IT IS FURTHER ORDERED that any offer to sell or buy the Property, and every agreement or contract for its sale or purchase, which offer, agreement, or contract was made or entered into prior to the Effective Date of the ALA is held to have lapsed and is now null, void, and of no effect whatsoever *such that no broker or agent involved with such offer, agreement, or contract is owed or otherwise entitled to receive, either now or in the future, any related commission, fee, or other compensation*[.]

(Emphasis added).

Hathorn testified that he did not send a copy of Ex. 9 to Hamwey or otherwise serve Charlie with that Order. To date, Hamwey has not filed a motion to modify or otherwise requested relief from or reconsideration of the above-italicized language of the Order, which remains a binding Order of the Court. Hathorn testified that the ALA language which J.P. King insisted be included in the Court's Order was intended to avoid claims such as Hamwey's for a

8

separate commission. Hathorn testified that the ALA language voids all prior contracts for commissions, that J.P. King relied on that language and would not have gone forward with the auction without the quoted language.

Ex. E is a realtor.com listing of the ranch property listing the price at $4.9 million. Charlie dated Ex. E as October 21, 2013, and testified that he maintained the listing through the auction date in November 2013. Charlie denied that he had been told to reduce the list price to $4.5 million, and testified that he was unaware of the provision in the stipulation, Ex. 3, or any other documents or instructions which directed him to reduce the list price.

The "Cooperating Broker Auction Incentive Program[6]" ("CBAIP"), J.P. King's Ex. 2, is signed by Charlie as broker, dated 11-6-2013. Paragraph 2 of J.P. King's Ex. 2 provides that it is limited to a sale at auction and specifically does not apply to any other sale of the property. Paragraph 3 provides that a commission will be paid to a broker who submits a registration form and qualifies by the broker's client becomes the buyer at auction who pays the total purchase price. Paragraph 7a provides that the broker will not claim any change or exceptions to the requirements under the terms of the CBAIP or a writing signed by the seller and a representative of J.P. King. Paragraph 7e provides: "Broker will be paid a commission only as set forth herein ...."

Hathorn testified that no other written agreement exists with Hamwey other than J.P. King's Ex. 2, and that he discussed the CBAIP with Charlie and explained to him that Hamwey had to bring the successful bidder to earn a commission. Charlie agreed that he has no written agreement with J.P. King changing the terms of the CBAIP, that he has no listing agreement or

---

[6] J.P. King's Ex. 2 (Doc. 374)/Ex. D attached to Ex. 18 (Doc. 334, attachment 23).

other agreement with J.P. King other than the CBAIP and that J.P. King was not a party to the modification at Ex. C. Charlie answered "No" when asked if he told J.P. King that he had an extended exclusive listing agreement.

When asked on cross examination if he would be entitled to a commission if his listing agreement expired with no extension, Charlie testified that he would not. Charlie testified that the CBAIP entitled him to a commission if he brought the winning bidder to the auction, and that he did not bring the winning bidder.

On November 12, 2013, Debtor filed another application to employ Charlie, Ex. 10. Ex. 10 seeks to employ Charlie as real estate agent to sell the 430 acres ranch property by assisting J.P. King with listing, advertising and selling such property. Paragraph 6 of Doc. Ex. 10 states that the terms of Charlie's employment "are as set forth in the J.P. King Auction Listing Agreement." Charlie signed another affidavit filed with Ex. 10 stating that he is disinterested and does not have any connection with the Debtor or parties-in-interest which would preclude his retention as real estate agent and that he does not represent any interest adverse to the Debtor or estate. Charlie admitted that he signed his affidavit about a week after signing the CBAIP, and after speaking with Deschenes who told him that he needed Charlie's affidavit for the bankruptcy court. The Court approved Ex. 10 by Order entered November 13, 2013. Ex. 11. Charlie admitted that Ex. 10 is the only application submitted to the Court for his employment as real estate agent to sell the ranch property.

The auction sale of the 430 acre ranch property took place on November 13, 2013. Charlie testified that he continued to list the ranch property up to the time of the auction. He checked the Multiple Listing Service and his computer, and talked to potential bidders. He

testified that he procured two bidders for the auction sale, and that he believed that his listing provided real value for the auction and that he expected compensation for his listing. However, he admitted that neither of his two bidders actually attended the auction, neither submitted a bid, and he did not produce the winning bidder. Nevertheless, and notwithstanding the terms of the CBAIP, Charlie argues that he is entitled to a listing commission of $30,000.

Debtor filed his motion for final approval of the auction sale of the ranch property on December 6, 2013 (Ex. 12). Ex. 12 states that the highest bid for the ranch property was $1 million plus a ten percent (10%) buyer's premium. It further states that the winning bidder assigned his rights to Brian and Wanda Lilley, and that from the proceeds of the sale, after normal closing costs and property taxes, a disbursement would be made to J.P. King in the amount of $100,000.00 pursuant to the Auction Listing Agreement and the remaining funds would be disbursed to FIB. None of the proceeds are to be allocated to the Debtor. Hathorn testified that J.P. King received its commission from the sale and was compensated for advertising and marketing which it did not share with Hamwey.

On cross examination Charlie testified that he does not have a written agreement with FIB or with J.P. King entitling him to a 3% or $30,000 commission on the sale. However, he testified that he spent money listing the ranch property over two and a half years under the listing agreements with Brown, maintained a for sale sign and showed the property to three persons. Charlie admitted that he has not submitted his expenses to the Bankruptcy Court and he has not filed an application for compensation.

Hamwey filed his amended objection to Debtor's motion for final approval on December 17, 2013. Ex. 16. FIB filed a reply to Hamwey's objection on December 18, 2013 (Ex. 17), with

an affidavit of J.P. King's vice president and general counsel J. Stephen Proffitt, III (Ex. 18). Hamwey filed its reply on December 24, 2014 (Ex. 19).

## DISCUSSION

**I. Contentions of the Parties.**

FIB contends that Hamwey's objection is inconsistent with the terms of the Debtor's confirmed Plan and should be summarily overruled based on the binding effect of confirmation under 11 U.S.C. § 1141(a), and that the confirmed plan sets forth the conditions under which Hamwey could market and sell the property to earn a commission. FIB argues that Hamwey failed to earn his commission under the confirmed plan because he failed to produce a qualified buyer under his exclusive listing, and failed to produce the winning bidder at the auction sale, which would have entitled Hamwey to a commission under the CBAIP with J.P. King. FIB further argues that Hamwey is not entitled to equitable relief because approval of his employment to sell the ranch property was not sought or approved until the last minute, and that it would be inequitable for FIB to absorb Hamwey's commission from its proceeds when no such commission was disclosed to the auction parties or the Court, or approved.

Hamwey asks for equitable relief under 11 U.S.C. § 105 and 11 U.S.C. § 327. Hamwey contends that depriving them of compensation for 3 years of listing and marketing work would be patently unjust because Charlie was unaware of the ALA with J.P. King, and that Debtor is equitably estopped from making representations about Hamwey's compensation which is at odds with the signed agreements between Hamwey and the Debtor. Hamwey argues that he is entitled to a 3% or $30,000 commission pursuant to his listing agreement, that Hamwey never intended to provide services pro bono and that it is inequitable to deny Hamwey compensation because he

was not a creditor which received notice and was not represented by an attorney until after the sale and relied on misrepresentations and double-dealing by the Debtor to continue providing services such as advertising and listing the ranch property.

The Debtor argues that the listing agreement with Hamwey expired prior to the date of filing of his Chapter 11 petition, and that it was never renewed with Bankruptcy Court approval until about the time of the auction sale, so Hamwey is not entitled to a commission based on the expired listing agreement. Debtor accuses Hamwey of going behind everyone's back and having the Debtor sign a backdated modification agreement trying to get a commission so has unclean hands disqualifying them from equitable relief. Debtor argues that under the ALA with J.P. King Hamwey did not produce the winning bidder on the ranch property so is not entitled to a commission.

**II. Hamwey's Employment.**

The dispute in this case is not about whether to grant the Debtor's motion for final approval of the auction sale of ranch property. Rather, the issue is whether Hamwey is entitled to a $30,000 commission from the sale proceeds based on his listing agreement with the Debtor. More particularly, based on Charlie's admission that he has no agreement with FIB, Hamwey's objection based on his claim for a listing commission is targeted to the $100,000 in commission to J.P. King. Hamwey has cited no agreement or statute which persuades the Court that it has any claim to the sale proceeds to be paid to FIB, the secured creditor.

Further, none of the auction sale proceeds are to be paid to the Debtor for several reasons. As set forth above, it is not clear that the ranch property is property of the estate at all. Schedule A lists Debtor's residence on Molt Road but it is not clear that the 430 acres of ranch property is

included in that entry. While Brown signed Ex. A, the original land listing contract, the seller is identified as Puunoa Estates LLC, not Brown. If Hamwey was requesting an award of professional fees from the estate, he would be required under Montana Local Bankruptcy Rule ("LBR") 2016-1(a) to file an application for compensation in conformity with Local Bankruptcy Form ("LBF") 17. Rule 2016-1(a) states specifically: "No compensation or reimbursement of expenses shall be paid a professional . . . until allowed by order of the Court under this Rule." F.R.B.P. 2016 includes a similar requirement of an application.

Hamwey has not filed an application for compensation in conformity with LBF 17and this Court declines to interpret Hamwey's objection as an application for compensation. Instead of crafting arguments for equitable relief, professionals seeking compensation from this Court need to comply with applicable rules. It is an insufficient excuse for noncompliance with the rules for Hamwey to plead that he was not represented by an attorney and was mislead by Brown and Debtor's attorney. The rules must be followed, or the Court will not award compensation.

Hamwey requests reasonable compensation for his listing services under § 327 and § 330, which govern employment and compensation of professionals. Section 328(a) allows a court to allow compensation of a professional person different from the compensation provided under the agreed terms and conditions of employment, "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated . . . ." While these statutory provisions authorize the Court to award Hamwey compensation, the Court declines to exercise its discretion because of their failure to follow applicable rules.

Section 327(a) allows a debtor-in-possession, as trustee, to employ professional persons "with the court's approval." This Court requires an application to approve employment of

professionals by a trustee or debtor-in-possession.  With respect to the ranch property, the Debtor did not file an application to approve employment of Hamwey until right before the auction sale on November 13, 2013, Ex. 10.

 Hamwey asks for a listing commission for his 3 years of listing the ranch property going back to September 27, 2010.  However, that listing expired and this Court did not approve Debtor's employment of Hamwey as real estate agent to sell the ranch property until November 13, 2013 (Ex. 11).  A professional seeking retroactive employment must establish the presence of exceptional circumstances and, in particular, must satisfy two requirements:  (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner.  *In re Atkins*, 69 F.3d 970, 974 (9th Cir. 1995); *In re Occidental Fin. Grp., Inc.*, 40 F.3d at 1062 (finding retroactive approval inappropriate where these two conditions were not met); *In re THC Fin. Corp.*, 837 F.2d at 392 (affirming denial of retroactive approval where these two conditions were not satisfied) (citations omitted).

 The post-petition renewals of the listing agreements between Hamwey and the Debtor were not disclosed and were not approved by this Court.  As such, they are of no legal effect and the listing agreement expired by the terms of Ex. A.  Hamwey's explanation for its failure to receive prior judicial approval of its employment is to blame Debtor and Debtor's attorney.  The Court does not deem that a satisfactory explanation, because Ex. D shows Debtor's attorney asking Charlie for documentation more than a year before the employment application was filed. Even if Hamwey's explanation was deemed satisfactory, Hamwey has failed to show that his services benefitted the estate in some significant manner.  Hamwey did not produce the winning

bidder at auction and the two bidders Charlie says he produced did not attend the auction. Whether Hamwey's services helped, it has not been shown to be in a significant manner.

Hamwey's rights to a listing commission also were addressed and terminated in the stipulation and agreement between Debtor and FIB, Ex. 3 at paragraph 5, which was approved by Order, Ex. 4, and terminated again in this Court's Order, Ex. 9, which incorporated the language from the ALA, which provides "that no broker or agent involved with such offer, agreement or contract is owed or otherwise entitled to receive, either now or in the future, any related commission, fee, or other compensation." These Orders were entered, and no motion for relief from or reconsideration of those provisions have been filed other than Hamwey's objections to the Debtor's Motion for final approval of sale.

Charlie signed the CBAIP with J.P. King, admitting therein that he "will be paid a Commission only as set forth herein . . . ." J.P. King Ex. 2. He admits that he failed to produce the winning buyer at auction, so Hamwey is not entitled to a commission under the CBAIP.

Notwithstanding the uncontroverted Orders, the ALA and CBAIP, Hamwey requests a commission based on equitable principles. Pursuant to § 105(a), the bankruptcy court is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *In re Reinertson*, 241 B.R. 451, 455 (9th Cir. BAP 1999). However, § 105(a) is not a "roving commission to do equity." *Willms v. Sanderson*, 723 F.3d 1094, 1103 (9th Cir. 2013); *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1070 (9th Cir.2004) (quoting *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1175 (9th Cir.2003)) (internal quotation marks omitted). A bankruptcy court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code." *Id.*;

16

quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Bankruptcy courts cannot use equitable principles to disregard unambiguous statutory language. *Anwar v. Johnson*, 720 F.3d 1183, 1187-88 (9th Cir. 2013), quoting *Childress v. Middleton Arms, L.P. (In re Middleton Arms, L.P.)*, 934 F.2d 723, 725 (6th Cir. 1991).

This Court declines to award Hamwey equitable relief based upon an expired listing agreement and their long-undisclosed attempts to renew the listing agreement. Hamwey's accusations against the Debtor and Debtor's attorney are not persuasive,[7] because the evidence shows that this Court's rules were not followed, for whatever reason. It is within the bankruptcy court's discretion to enforce the Bankruptcy Rules and local bankruptcy rules. *See Price v. Lehtinen (In re Lehtinen)*, 332 B.R. 404, 412-14 (9th Cir. BAP 2005), *aff'd*, 564 F.3d 1052 (9th Cir. 2009); *see also Weil v. Neary*, 278 U.S. 160, 169 (1929) (local rules have the force of law) (citations omitted).

Accordingly,

**IT IS ORDERED** a separate Order shall be entered overruling Hamwey's objections and granting Debtor's "Motion for Final Approval of Auction Sale of Ranch Property" (Doc. 303).

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

---

[7]Hamwey fails to explain how the conduct of the Debtor and Debtor's attorney can justify taking money away from J.P. King's commission.